IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PARKER HANNIFIN CORPORATION, | ) | Case No. 1:01CV1057 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Judge Ann Aldrich |
| | ) | |
| STEADFAST INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | MEMORANDUM AND ORDER |

This is an insurance contract case, between plaintiff Parker Hannifin Corporation ("Parker") and defendant Steadfast Insurance Company ("Steadfast"). The dispute arises over the extent of Steadfast's liability for damages paid by Parker following the malfunction of certain Parker products. On January 4, 2002, the court denied Steadfast's motion to dismiss Count II of Parker's complaint (Docket No. 24). Now before the court are Parker's motion for partial summary judgment (Docket No. 74) and Steadfast's corresponding motion for summary judgment in its favor (Docket No. 72). The court heard oral argument on these motions on March 5, 2004. For the following reasons, the court grants Parker's motion, denies Steadfast's motion, and enters partial summary judgment in Parker's favor.

## I. Background

Parker manufactures gaskets for use as component parts in various manufactured products sold throughout the United States. Parker is a party to a commercial umbrella liability insurance policy with Steadfast. Beginning in 1995, Parker manufactured and sold expansion chamber gaskets to Zenith

Electronics Corporation of Texas ("Zenith"), a wholly-owned subsidiary of Zenith Electronics Corporation, to be used as component parts in certain projection television sets.

In September and October of 1998, two purchasers of Zenith televisions found that the carpet underneath their television sets had charred. Upon investigation, Zenith determined that defective gaskets produced by Parker caused the fires. Also in October of 1998, a fatal house fire occurred at the residence of the Arzie family in Alaska. The Arzies apparently believe that the fire was caused by a Zenith television containing a defective Parker gasket. After these incidents occurred, Zenith recalled and repaired as many television sets containing the Parker gasket as possible, incurring estimated costs of at least $7,528,737 by March 31, 2000, and anticipating additional costs of at least $6,933,790 after March 31, 2000.

In July of 1999, Zenith filed suit against Parker to recover these costs. Zenith and Parker eventually agreed to a court-supervised mediation procedure, and on August 1, 2000, they reached a settlement in which Parker agreed to pay Zenith a lump sum of $3,000,000 for its damages due to recall, repair, and replacement costs through March 31, 2000 and 30 percent of losses suffered after March 31, 2000 up to a cap of $2,000,000. The settlement, however, did not limit any potential liability of Parker to Zenith or to any other persons in connection with a lawsuit filed against Zenith by the Arzies or with any other potential lawsuits.

Before and during the settlement negotiations, Parker and Steadfast had discussed Steadfast's potential obligations under the insurance contract to pay the full amount of covered claims in excess of the self-insured retention (SIR) of $2,000,000. However, Steadfast declined to comment on the terms of the final, written settlement. Parker sought reimbursement from Steadfast for $1,100,000 in settlement payments, but Steadfast refused. Parker then filed suit in this court to recover for the settlement

payments under the contract, and to obtain a declaration that the *Arzie* lawsuit, as well as any potential but unidentified lawsuits claiming damages due to fire or smoke, arise out of the same occurrence that was the subject of the settlement. Such a declaration would obligate Steadfast to investigate and defend against such claims and free Parker of the obligation to absorb the SIR of $2,000,000 in connection with these lawsuits.

Parker seeks compensatory damages for breach of contract in Count I of the complaint, and for declaratory relief in Count II. Steadfast has counterclaimed, seeking a declaration either that it is not obligated to pay or, in the alternative, that Parker must incur the $2,000,000 SIR for each claim for which Parker may have to pay damages. Steadfast's counterclaim appears to incorporate its affirmative defenses. Parker also raises various estoppel- and waiver-related affirmative defenses.

## II. Discussion

### A. Standard of Review

Under Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986); *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004).

If the movant succeeds, the burden then shifts to the nonmoving party to demonstrate the existence of a material dispute as provided in Rule 56(e):

> An adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so

> respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). Parties opposing summary judgment must go beyond the pleadings and produce some type of evidentiary material in support of their position. *See Celotex,* 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, this court must view the evidence in a light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Hamby v. Neel*, 368 F.3d 549, 556 (6th Cir. 2004); *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson,* 477 U.S. at 248. Determination of whether an issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the court must decide whether the evidence is such that a reasonable juror "could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict" or whether the evidence is "so one-sided that [the moving party] must prevail as a matter of law." *Id.* at 252. Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**B.    Scope of the Policy; Burden of Proof**

Parker first argues that, to merit the entry of summary judgment in its favor, it need only demonstrate that in the Zenith litigation, Zenith asserted a claim within the scope of the Steadfast policy. Steadfast counters that Parker is required to demonstrate that the Zenith litigation settled claims for specifically covered damages. In essence, Steadfast seeks an allocation of the settlement payments between those amounts paid for damages arising under the policy, and all other amounts.

-4-

In support of its position, Parker cites alleged admissions by a Steadfast corporate representative that the latter was not "challenging the reasonableness" of the Zenith settlement. Parker asserts that this admission constitutes a statement of intent not to seek allocation. Parker also contends that an allocation of "covered" versus "non-covered" damages would be virtually impossible at this stage.

The strongest support for Parker's position, however, lies in its citation to *Associated Indemnity Corp. v. Dow Chemical Co.*, 814 F. Supp. 613 (E.D. Mich. 1993), in which the court ruled thusly:

> If an underlying claim was settled without an adjudication, the relevant property damage in the insurance litigation is the property damage which was seriously assumed by the settling parties to have been potentially provable by the underlying claimants in suits against the insured.
>
> In actual fact, there may have been no property damage. The realistic possibility, however, that the existence of property damage could be proven in an underlying suit is a necessary element of any reasonable settlement that is more than a mere nuisance settlement.
>
> If a settlement is negotiated upon the assumption that damage to particular property was potentially provable by the underlying claimant, then the fact that there was damage to that property becomes the law of the case in the coverage litigation. Furthermore, if the settlement is based upon the assumption that property damage of a particular kind and dimension was potentially provable, then the fact that there was property damage of that particular kind and dimension becomes the law of the case. A liability insurer cannot defend a coverage issue by attacking the credibility of evidence that such property damage occurred.

*Id*. at 622 (footnote omitted). As Parker observes, the holding in *Associated Indemnity* was predicated on facts substantially similar to those at bar. A gas pipe, manufactured from resin produced by Dow Chemical, was installed for delivery of natural gas to rural Alberta, Canada. The pipes, which bore several heterogeneous qualities each to the others (from differences in material composition to installation and operating conditions), malfunctioned. The province of Alberta undertook a replacement

program, and both the causes of the malfunction and the number of "occurrences" under the relevant insurance policy were key issues in the subsequent litigation.

Steadfast neither denies these similarities nor offers especially compelling support for its argument in favor of allocation. Steadfast asserts that Parker bears the burden of proving the coverage giving rise to a duty to indemnify – under Ohio law,[1] "[t]he duty to indemnify only arises when there is, in fact, coverage." *Reliable Springs Co. v. St. Paul Fire & Marine Ins. Co.*, 869 F.2d 993, 994 (6th Cir. 1989) (citing *Riverside Ins. Co. v. Wiland*, 474 N.E.2d 371 (Oh. Ct. App. 1984)).[2] But none of the cases cited by Steadfast states a generally applicable requirement of allocation (*i.e.*, shifting the burden of more specific proof of coverage). In the absence of such a pronouncement, and given Parker's evidence regarding the obstacles presented by allocation in this case, this court is compelled to adopt the approach set forth by the Michigan court in *Associated Indemnity*.

Parker's evidence concerning the progression of the Zenith litigation leaves no genuine doubt concerning the seriousness of its assumptions, or those of the Zenith plaintiffs. The court will therefore consider the full costs of repair and replacement (including establishment and maintenance of the retrofit program and call center) as damages "seriously assumed by the settling parties to have been potentially provable by the underlying claimants," *Associated Indemnity*, 814 F. Supp. at 633, unless Steadfast can demonstrate that it is released from its duty to indemnify by the policy language or applicable exceptions.

**C.  Damages "Caused by an Occurrence" Under the Policy**

---

[1] The court has previously determined that Ohio law governs the issues in this case. *See* Docket No. 61.

[2] Steadfast fails to note that the *Reliable Springs* court followed this language with an analysis of policy exceptions (as will be performed *infra*) rather than proceeding with any specific allocation of "covered" versus "non-covered" damages.

This is perhaps the most contentious, and difficult, issue in the litigation. Parker urges a construction of the language in the policy agreement --"All bodily injury, or property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence"-- which effectuates the parties' "unmistakable intent" to group all claims under one "per occurrence" self-insured retention.

Steadfast asserts that the $2,000,000 SIR applies separately to each damage-causing "occurrence," defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions" (and, Steadfast contends, not including simple faults in design or manufacture). Steadfast notes that the Parker gaskets manifested a number of different defects, and that each type of defect had a number of different potential causes – a fact pattern to be differentiated from cases in which "one proximate, uninterrupted and continuing cause . . . resulted in all the injuries and damage." *Honeycomb Systems, Inc. v. Admiral Insurance Co.*, 567 F.Supp. 1400, 1405 (D. Me. 1983) (citation omitted). Steadfast also cites a line of cases in which courts have held that each separate sale or shipment of a defective product constitutes a different "occurrence." *See, e.g., Michigan Chemical Corp. v. American Home Assurance Co.*, 728 F.2d 374 (6th Cir. 1984) (applying Illinois law); *Maurice Pincoffs Co. v. St. Paul Fire and Marine Ins. Co.*, 447 F.2d 204 (5th Cir. 1971).

Again, this court finds Parker's argument to be more persuasive, and better bolstered by precedent, on this issue. Numerous courts have recognized that "the calculation of the number of occurrences must focus on the underlying *circumstances* which resulted in the personal injury and claims for damage rather than each individual claimant's *injury*." *Owens-Illinois, Inc. v. Aetna Cas..& Sur. Co.*, 597 F.Supp. 1515, 1525 (D.D.C. 1984) (applying Ohio law) (emphasis in original). *See also Michigan Chem. Corp.*, 728 F.2d at 379-80; *International Surplus Lines Ins. Co. v. Underwriters at*

*Lloyd's of London*, 868 F.Supp. 917, 923 (S.D. Ohio 1994) (holding that numerous product liability suits involved one "occurrence" for purposes of a $1 million deductible). As noted *supra*, the underlying circumstances in this case are similar in almost every way to those before the court in *Associated Indemnity*. As a result, that court's ruling continues to prove instructive:

> In the complex industrial world there are very few situations in which there are not multiple causes of property damage. In identifying the causes of property damage for the purpose of determining the number of occurrences, the causes of the property damage must be determined from the insured's point of view . . . .
>
> All of the resin sold by Dow Canada was intrinsically harmful because there was an unexplained property or characteristic of [the resin] such that all pipe extruded from it, by whatever method, was deficient for use in the rural gasification program. The multimillion dollar settlement reflected an assumption by the negotiating parties that there was a realistic possibility that this fact could be proven in the underlying lawsuits . . . .
>
> An insured is entitled to a reasonable interpretation of its policy to minimize the cost of coverage litigation . . . .
>
> In this case most of the damage was directly attributable to the overarching cause. Furthermore, it would be virtually impossible to sort out the damage, if any, which was solely attributable to other causes for which the insured was responsible.
>
> The production of defective resin was the sole, proximate, uninterrupted, and continuing cause of all of the property damage in the case for which Dow Canada could be responsible.
>
> There is absolutely no basis on the record before the Court to rule that the damage to each co-op stemmed from a separate occurrence.

*Id.*, 814 F.Supp. at 622-623.

Parker also challenges the "multiple occurrence" strand of Steadfast's argument with evidence that Steadfast agreed with Parker in July 2000 that only one SIR of $2,000,000 would apply to any settlement with Zenith. Parker states that it relied on this representation in conducting its settlement

-8-

negotiations with Zenith, and calls this "a classic example of bad faith conduct by an insurer." Without reaching the specifics of Steadfast's representations, this court finds ample justification for ruling as a matter of law that the damages seriously assumed to be provable by the parties to the Zenith litigation arose from a single occurrence-- namely, the malfunction of Parker gaskets-- under the relevant policy language.[3]

**D.  The Policy Exclusions**

  *1.  The "Own Product" Exclusion*

Steadfast might nonetheless avoid its duty to indemnify if it can demonstrate that the relevant damages were subject to certain exclusions contained in the policy language. In pursuit of this theory, Steadfast first cites the "insured's product" or "own product" exclusion, contained in the relevant policy and held by Ohio courts to allow limitation of coverage for property damage to the insured's product, but not to damages to other property caused by that product. *See Ferro Corp. v. Blaw-Knox Food & Chem. Equip. Co.*, 2002 Ohio 5472, 2002 WL 31260495, at *4 (Ohio Ct. App. Oct. 10, 2002); *Acme Steak Co.*, 2000 WL 1506199, at *7.

Parker argues that the vast majority of the settlement expenses were incurred to remedy damages to plaintiffs' property as a result of the gasket malfunction, and that little to no money was expended for actual repair of the gaskets themselves. Steadfast challenges Parker's restrictive reading of the "own products" exclusion (and the relevance of the cases purporting to advance such a reading), arguing that

---

[3] As in all such cases, it bears noting that Steadfast had an opportunity to avoid the classification of similar damages as arising out of a single "occurrence." Steadfast chose instead to draft the policy with language substantially identical to that employed in *Associated Indemnity*. The equities of such a situation are the same as those which gave rise to the more general rule: "When the language of the policy is doubtful or uncertain, the language will be construed strictly against the insurer and liberally in favor of the insured party." *Acme Steak Co. v. Great Lakes Mech. Co.*, 2000 Ohio 2566, 2000 WL 1506199, at *6 (Ohio Ct. App. Sept. 29, 2000) (citing *Faruque v. Provident Life & Acc. Co.*, 31 Ohio St. 3d 34, 38, 508 N.E.2d 949, 952 (1987)).

such language means that "there is no coverage for any expenses incurred to repair or to replace" the defective product. *Hartzell v. Federal Insurance Co.*, 168 F.Supp.2d 789, 803 (S.D. Ohio 2001).

Neither party is precisely correct, as the state of the law in this area remains in dispute, particularly when (as here) the costs of a replacement program are sought as part of the damage to property caused by failure of an insured's product.

> The most important issue that arises in connection with the ["own product" exclusion] is whether the cost of repairing/replacing an insured's defective product is entirely uncovered. Some courts have held that no portion of the repair/replacement program is covered. Other courts, however, have held that property damage occurs as of the date the insured's defective product/work is incorporated into another product. Under that rule, the cost of a repair/replacement program would probably not be excluded because the cost of the program would represent the cost of eliminating the property damage to a product that was not the insured's product.

Allan D. Windt, INSURANCE CLAIMS AND DISPUTES, § 11:10, at 427-431 (3d ed. 1995) (footnotes omitted).

Having reviewed the cases in support of each approach, this court is satisfied that the latter method/rule is more suited to the facts of this case. *See, e.g., Maryland Cas. Co. v. W.R. Grace & Co.*, 794 F.Supp. 1206 (S.D.N.Y. 1991); *Colonial Gas Co. v. Aetna Cas. & Sur. Co.*, 823 F.Supp. 975 (D. Mass. 1993). As in the cited cases, the disparity between the costs of actual damage to homes and furnishings and the (potentially miniscule) cost of actual gasket repair, renders it both fair and efficient to classify the repaired/replaced product as the Zenith televisions. *Cf. Imperial Cas. & Indem. Co. v. High Concrete Structures, Inc.*, 858 F.2d 128, 134-135 (3d Cir. 1988) (holding that the purchaser "created a new product having a value in excess of the value of the product supplied by the insured, and suffered damage to more than just the insured's product," new product not within scope of exclusion)

(citing *Firemen's Ins. Co. of Newark v. Bauer Dental Studio, Inc.*, 805 F.2d 324, 325 (8th Cir. 1986) (same)).

Steadfast (which bears the burden of proof on an affirmative defense, such as the applicability of policy exclusions) clearly seeks to use the "own product" argument to reinstate its quest for an allocation of the Zenith damages. The court has already noted the problems of proof that would attend such an approach, and found as a matter of law that no such allocation is required for damages reasonably expected to be provable by Parker and the Zenith defendants. Having additionally found that the proper "damaged product" for purposes of the Zenith settlement was the television sets themselves, the court finds that Steadfast cannot satisfy its burden on this issue; no genuine issues of material fact remain.

### 2. *The "Sistership" Exclusion*

Finally, Steadfast seeks summary judgment in its favor on the basis of the policy's "sistership" or "product withdrawal" exclusion,[4] which excludes coverage for defective products "withdrawn from the market or from use." Parker cites a bevy of cases strictly construing such provisions, before pointing out that the defective Zenith televisions were repaired on site and never subject to a recall. Steadfast counters that at least "553 television sets were replaced or bought back from customers . . . . The gaskets contained in these television sets were therefore withdrawn from the market."

In its continuing effort to force allocation of "covered" damages, Steadfast proposes an overly broad application of this exclusion.

---

[4] "This description is derived from an incident in the aircraft industry in which one plane crashed and its 'sisterships' were thereafter grounded and recalled by the manufacturer in order to correct the common defect which had caused the crash." *Arcos Corp. v. American Mut. Liab. Ins. Co.*, 350 F. Supp. 380, 385 n.2 (E.D. Pa. 1972).

> The provision is intended to exclude from coverage the cost of preventative or curative action by withdrawal of a product in situations in which a danger is to be apprehended. It is not, however, intended to exclude from coverage damages caused by the very product whose failure to perform properly aroused apprehension about the quality of 'sister' products. Still less is it intended to exclude from coverage damages arising from the malfunctioning of a product where no 'sister' products are involved.

*Todd Shipyards Corp. v. Turbine Service, Inc.*, 674 F.2d 401, 419 (5th Cir. 1982) (citations omitted). The costs of the retrofit program and the additional costs incurred for settlement with the Zenith plaintiffs are readily classifiable as damages caused by the gaskets, *i.e.*, "the very product whose failure to perform" aroused apprehension about the television sets. The few actual withdrawals from the market made in conjunction with this program are insufficient to change this classification, or to carry Steadfast's burden on this affirmative defense. Rather, they are recoverable as reasonably foreseeable consequential damages. "Since the term 'because of property damage' can reasonably be interpreted to mean all liability arising from such damage, an insurance company wishing to exclude consequential damages should use specific language to that effect." *American Home Assurance Co. v. Libbey-Owens-Ford Co.*, 786 F.2d 22, 26 (1st Cir. 1986) (citing *United Properties, Inc. v. Home Ins. Co.*, 311 N.W.2d 689, 692 (Iowa Ct. App. 1981)).

  This court therefore finds, as a matter or law, that neither of the exclusions cited by Steadfast apply to block recovery by Parker or require summary judgment in Steadfast's favor. As noted *supra*, the court also finds, as a matter of law, that Parker need only demonstrate that it advanced for settlement of the Zenith suit sums which were "seriously assumed by the settling parties to have been potentially provable," and that all damages will then be held to have arisen from a single "occurrence" under the Steadfast-drafted policy. Parker has ably demonstrated the seriousness of its assumptions in advancing the settlement money.

These findings both alleviate the need for further presentation of evidence on the amount of "covered" damages or number of "occurrences," and necessitate a finding that no genuine issues of material fact remain concerning Parker's claim for $1,000,000 in excess of the SIR.

### III.     Conclusion

For the foregoing reasons, the court denies Steadfast's motion for summary judgment, and enters partial summary judgment in favor of Parker. The court awards Parker $1,000,000 from Steadfast, plus prejudgment interest, as damages in excess of the self-insured retention.

The parties are directed to file a joint status report on any issues that remain unaddressed by this grant of partial summary judgment on or before September 15, 2006.

IT IS SO ORDERED.

              /s/ Ann Aldrich
            ANN ALDRICH
            UNITED STATES DISTRICT JUDGE

**Dated: August 9, 2006**